John C. CAPEK, et al., Plaintiffs

v.

Mark MENDELSON, et al., Defendants

v.

M. Mark MENDEL, et al., Third Party Defendants.

Civ. A. No. 91–7396.

United States District Court, E.D. Pennsylvania.

May 10, 1993.

Allen L. Feingold, A.L. Feingold Associates, and William A. De Stefano, De Stefano & Warren, P.C., Philadelphia, PA, for plaintiffs.

Louis B. Kupperman, Obermayer, Rebmann, Maxwell & Hippel; and Allen Weinberg, Philadelphia, PA, for defendants/third-party plaintiff.

Dennis J. Cogan, Abramson, Cogan, Kogan, Freeman & Thall, P.C.; John W. Walter and Paul A. Bechtel, Jr., Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, PA, for third-party defendant.

## MEMORANDUM

ROBRENO, District Judge.

Before the Court are plaintiff Allen L. Feingold's motion to "strike, set aside, and mark void" the settlement agreement between the parties, and defendants Mark Mendelson and Hampton Real Estate Group, Inc.'s ("the Mendelson defendants") motion to enforce the settlement agreement and "strike" Feingold's motion. The ultimate issue raised in both motions is whether the parties have reached a binding settlement agreement which puts an end to this hard fought business litigation.[1]

---

1. Also pending is a motion by the Mendelson defendants to quash a subpoena and for sanctions. For reasons set forth in this Memorandum and in the attached Order, the motion to quash the subpoena will be denied as moot and the motion for sanctions will be denied.

Upon review of the motions and the answers thereto and after an evidentiary hearing, the Court finds that a settlement agreement among all parties has been reached, and that, despite Feingold's assertions to the contrary, no party has engaged in conduct that warrants recision of the settlement agreement. Accordingly, the Court will issue an order dismissing the case.

## I. BACKGROUND

Plaintiffs in this matter are John C. Capek, C. Richard Scipione, Athole G. Jacobi, William Kozin, and Allen L. Feingold. Feingold is an attorney. He appears in this matter on behalf of himself and plaintiffs Jacobi and Kozin.[2] On November 29, 1991, plaintiffs filed a complaint against the Mendelson defendants. The complaint set forth a number of claims arising out of the promotion and sale of certain securities. The Mendelson defendants subsequently filed a third party complaint against third party defendants M. Mark Mendel and M. Mark Mendel, Ltd. ("the Mendel defendants"). The Mendel defendants thereupon counterclaimed against the Mendelson defendants. Later, plaintiffs Capek and Scipione were granted leave to amend their complaint to assert direct claims against the Mendel defendants.

The case was transferred to my docket on August 24, 1992. Although at the time of the transfer the case had been pending for nearly a year and while the litigation had engendered much acrimony among the parties, not so much as a single deposition had been taken. This state of affairs lead the Court to conclude: "[A]fter a review of the pleadings, ... consideration of the discovery motions before the court, and a hearing, it is clear to the court that, left to their own devices, the litigants in this case will continue to squander not only their own time and money but also will continue to call upon scarce judicial resources." *Capek v. Mendelson,* 143 F.R.D. 97 (E.D.Pa.1992). In an effort to break the logjam the Court entered a case management order providing for expedited deadlines .and procedures for the conduct of discovery, set-

ting a discovery cutoff date of December 18, 1992, and specially listing the case for trial to begin on February 15, 1993. At the request of the parties, the Court also agreed to preside over settlement discussions. *Capek,* 143 F.R.D. at 98.

On September 22, 1992 and September 24, 1992, the Court met with counsel for all parties, with nearly all the principals also present. By the conclusion of the second conference, which began in late afternoon and extended until past 8 p.m., all parties except plaintiffs Capek and Scipione had reached agreement on all issues. Because plaintiffs Capek and Scipione refused to agree to the terms of the settlement reached in chambers, the September 24, 1992 settlement conference ended without the parties reaching a settlement. This much is agreed to by all parties.

The efforts to settle the case that followed the conferences in chambers, i.e. the conduct of the parties between September 24, 1992 and December 29, 1992, the date on which a written settlement agreement was finally signed by all parties, gives rise to the instant motions. Because the motions turn, in large part, on factual issues arising out of the question of whether negotiations between the parties resulted in a binding settlement prior to the signing of the final written agreement, the Court held a hearing on February 16, 1993. *See Tiernan v. Devoe,* 923 F.2d 1024, 1031 (3d Cir.1991) ("Where material facts concerning the *existence* or *terms* of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing," *quoting Mid–South Towing Co. v. Har–Win, Inc.,* 733 F.2d 386, 390 (5th Cir.1984)). At the hearing, the parties engaged in direct and cross examination of witnesses, and provided documentary evidence in support of their positions. The following is a summary of the evidence gleaned from the proof presented at the hearing.

On October 6, 1992, nearly two weeks after the in chambers settlement conference, counsel for Capek and Scipione distributed a letter (the "October 6 letter") via facsimile to

---

**2.** All other parties in this action are represented by attorneys that have no involvement in the

facts of the underlying dispute.

counsel for each of the parties, purporting to verify that an agreement "in principle" had been reached by all parties. The letter set forth a schedule for the tender of four interim payments to be made by the defendants and the third-party defendants to plaintiffs. The payments, in varying amounts, were to be delivered to an escrow agent in four installments, the last to be paid on December 28, 1992. Counsel for the Mendel defendants was designated as the "escrow agent." It was the responsibility of the escrow agent to place the interim payments in an interest bearing escrow account. Under the provisions of the October 6 letter, the settlement funds were to be available for disbursement to plaintiffs the day after the tender of the final interim payment. The October 6 letter concluded by stating that "[e]veryone should understand that unless all settlement funds are paid by the defendants by December 28, 1992 and can be disbursed to plaintiffs the next day, there is no settlement and the case will proceed to trial." Counsel for each of the parties signed the letter.[3]

After signing the October 6 letter, the parties exchanged at least three written drafts of a lengthy settlement agreement. Each version of the settlement agreement contained a provision that required interim payments on specified dates.[4] Consistent with the October 6 letter, the earliest of these drafts stated that the Mendelson defendants' final payment would be due on December 28, 1992. The drafts and the October 6 letter, however, differed as to the date for final distribution of the settlement proceeds to the plaintiffs. Specifically, the drafts stated that distribution to the plaintiffs would take place five or six business days after the date of the last payment[5] or "as soon thereafter as the rules of the banking institution permit, to allow for clearance of checks," whichever is later, while the October 6 letter had contemplated distribution on the day after tender of the last interim payment.

Sometime after the signing of the October 6 letter, Feingold informed the parties that he wanted to receive his proceeds during the 1992 calendar year. Feingold asked that the parties change the date for final payment to December 24, 1992. Feingold testified at the hearing that the purpose of this request was to assure that he would receive distribution of the proceeds during the 1992 calendar year. The latter versions of the written settlement agreement exchanged by the parties incorporated this change. Feingold also objected to the fact that the early draft settlement agreement did not include a provision relating to the assignment of some of the other plaintiffs' rights to Feingold. Language to this effect was eventually incorporated into the written agreement. Each version[6] of the settlement agreement, including the final version, also included the following language:

> In the event, however, that the entire settlement funds are not paid in accordance with the above schedule all monies paid theretofore will be returned to the sources from whence they came, there will be no settlement, and the provisions of this Release will be deemed void and of no effect.

Finally, after the parties had included Feingold's changes in the written drafts and had worked out other minor details, *inter se*, Feingold signed the final version of the settlement agreement on December 23, 1992. Several days later, Feingold learned, apparently for the first time, that the last three of

---

**3.** The October 6 letter is set forth in full in Appendix "A" to this Memorandum. No proof was offered at the hearing as to when each attorney signed the letter.

**4.** From testimony offered at the hearing, it seems that there were a total of three, and possibly four, written versions of the settlement agreement that were distributed among the parties. As evidence, however, the parties introduced only what appear to be the first and last of these, the last being the version that was eventually signed by all parties. Accordingly, the Court can only conclude that the first and last version of the settlement agreement contained the provisions referred to above. Absent evidence to the contrary, however, it seems logical to assume that these provisions were also present in the intervening versions.

**5.** The final version of the settlement agreement amended an earlier version by requiring distribution no later than five, as opposed to six, business days after the last interim payment.

**6.** *See* note 4, *supra*.

the Mendelson defendants' four interim payments had not been escrowed. Instead of escrowing these payments, the Mendelson defendants had delivered checks, on the dates set forth in the October 6 letter and in the draft settlement agreements, to their attorneys, brothers Allen and Martin Weinberg, who withheld delivery of these checks to the escrow agent.[7] At the hearing, Messrs. Weinberg both testified that they withheld the checks because it was their belief that no settlement agreement had yet been reached. *See, e.g.,* Transcript of February 16 Hearing ("Transcript"), at 33, 37, 39, 59, 78. Allen Weinberg testified that each time he received one of these latter three checks from the Mendelson defendants, he notified the escrow agent and counsel for plaintiffs Capek and Scipione that he was holding the moneys. Allen Weinberg, however, did not inform Feingold that he had received these checks from the Mendelson defendants or that he was keeping them in his possession instead of delivering them to the escrow agent. The reason stated by Allen Weinberg for not notifying Feingold of his actions was that, according to Weinberg, Capek and Scipione, and not Feingold, were the parties principally concerned about the timing of payments, and that Capek and Scipione were the parties who offered the most resistance to finalizing a settlement. Therefore, in Weinberg's view, the parties most affected by his act of withholding of the checks were the parties he notified, i.e. the escrow agent, Capek, and Scipione. Transcript, at 59, 78.

The last party signed the written settlement agreement on December 29, 1992.

That same day, immediately upon being advised that the last party had signed, the Weinbergs delivered the checks to the escrow agent. Four business days later, on January 5, 1993, the escrow agent attempted to disburse the appropriate funds to each of the plaintiffs. Feingold, however, refused to accept the check for the amount he was entitled to receive. Instead, Feingold claimed that the settlement agreement had been rendered void because: 1) the Mendelson defendants' interim payments had not been submitted to the escrow agent on the appropriate dates, and 2) the failure of the Mendelson defendants to make interim payments caused the disbursement of settlement proceeds to take place in an untimely fashion.

Despite this protestation, Feingold subsequently accepted that portion of his share of the settlement proceeds paid by the Mendel defendants, plus an amount of "damages" from the Mendel defendants for "late" distribution. Feingold did not disclose to the Court the amount of damages paid by the Mendel defendants.

Feingold now wants the settlement agreement "rescinded" and the case scheduled for trial. All other parties, i.e. his co-plaintiffs, the defendants, and the third party defendants, want the settlement agreement enforced.

## II. *DISCUSSION*

### A. *Jurisdiction* [8]

Questions relating to the enforcement of settlement agreements typically arise under one of two scenarios.[9] In the first, the trial

---

7. The record is far from clear as to exactly what occurred with respect to the Mendelson defendants' first interim payment. The parties do not appear to dispute that this first payment was made by the Mendelson defendants sometime after the signing of the October 6 letter. *See* Transcript of February 16 Hearing, p. 6, 33. It also seems that this payment was subsequently placed into the escrow account, in that Feingold does not appear to argue that the he lost interest on the first payment. *See* Section IIC, *infra*. The parties did not make clear to whom the payment was delivered and how it became escrowed.

8. The Court raises the issue of jurisdiction *sua sponte*, since the parties' briefs do not address

the issue. Indeed, the parties barely briefed any issue at all. Feingold's initial motion contains no memorandum, in violation of Local Rule of Civil Procedure 20(c), while the two page brief submitted by Feingold in response to the Mendelson defendants' motion barely touches on the relevant legal issues. Meanwhile, the Mendelson defendants have filed a three page brief that is no more enlightening than their adversaries'. The fact that *both* parties have failed to submit adequate briefs on this dispositive matter is inexcusable.

9. *See Musifilm, B.V. v. Spector,* 568 F.Supp. 578 (S.D.N.Y.1983) (describing the two scenarios in greater detail than that set forth herein).

court is asked to evaluate the enforceability of a settlement agreement after the underlying dispute has already been dismissed by virtue of the settlement.[10] The case *sub judice*, however, was never dismissed, since the parties did not formally advise the Court that the case had been "settled" (prior to the recent flurry of enforcement motions),[11] or request dismissal of the case pursuant to Local Rule of Civil Procedure 23(b), relating to the dismissal of settled cases. Thus, no order of dismissal was ever issued. In fact, this action has been on the Court's active docket since the time it was filed and it was specially listed to be tried on February 15, 1993.

The facts underlying the current motions, therefore, present the second scenario in which settlement enforcement issues arise: "[T]he action is still pending, and the party seeking enforcement of the settlement agreement asserts the agreement—repudiated by his adversary—to terminate the action." *Musifilm, B.V. v. Spector*, 568 F.Supp. 578, 581 (S.D.N.Y.1983), citing, *Autera v. Robinson*, 419 F.2d 1197 (D.C.Cir.1969); *Morris v. Gaspero*, 522 F.Supp. 121 (E.D.Pa.1981); *United States v. Buckner & Moore, Inc.*, 505 F.Supp. 409 (W.D.Okla.1979), and *Fairfax Countywide Citizens Ass'n. v. County of Fairfax*, 571 F.2d 1299, 1304, n. 12 (4th Cir.), *cert. denied*, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978). In this second situation:

> [A] court will enforce the settlement agreement if it determines that the agreement is a valid contract. There, the enforcement proceeding is logically held in the context of the pending action. If the court determines that the agreement is valid, it will order the action dismissed. If on the other hand, the court finds the agreement invalid, the action will remain open on its docket.

*Musifilm*, 568 F.Supp. at 581. *See also, Tiernan, supra*, 923 F.2d at 1031.

Given that this case remained active at all times, Feingold's initial motion to "strike, set aside, and mark void" the settlement is a nullity, since there is not now nor has there even been a "settlement" on the Court's docket that can be stricken. The operative motion now pending is, instead, the Mendelson defendants' motion to "enforce" the settlement. Viewed in this light, the Mendelson defendants' motion to enforce the settlement is in essence a motion to dismiss the case on the ground that the matter has been settled.[12]

### B. The Mendelson Defendants' Obligation to Make Interim Payments

As noted above, Feingold maintains that the settlement agreement reached by the parties is rendered void by virtue of the Mendelson defendants' failure to make timely interim payments to the escrow agent. As best the Court can determine, Feingold appears to assert two primary grounds for the existence of such a duty on the part of the Mendelson defendants.

First, Feingold at times appears to take the position that the December 29, 1992

---

10. Post-dismissal enforcement of settlement agreements was addressed recently by the Third Circuit in *Sawka v. Healtheast, Inc.*, 989 F.2d 138 (3d Cir.1993). In *Sawka*, the court ruled that courts have the power to enforce settlements in cases that were once before them only if they incorporate the settlement into an order of the court or express an intent to retain jurisdiction. *See also Rudinger v. Insurance Data Processing, Inc.*, 816 F.Supp. 371 (E.D.Pa.1993) (same).

11. Periodically, the parties improperly "copied" the court with their correspondence. The "copies" were generally self-serving missives. The court was forced to put a stop to this practice by Order of January 7, 1993 (Docket No. 43).

12. Feingold's motion to "strike, set aside, and mark void" the settlement agreement will be denied as moot, since there is no settlement agreement on the docket of the Court. The Mendelson defendants' motion to "strike" Feingold's motion for failure to include a memorandum (see Local Rule of Civil Procedure 20(c)) will be denied, as the Court will construe Feingold's brief in response to the Mendelson defendants' motion as a brief in support of his own motion.

It could be said that the Mendelson defendants' motion to enforce the settlement agreement is most properly viewed as a motion to dismiss the case pursuant to Local Rule of Civil Procedure 23(b). Alternatively, this motion might perhaps also be deemed a motion for involuntary dismissal pursuant to Fed.R.Civ.P. 41(b). The precise designation is of little moment. No matter how the Mendelson defendants should have titled their motion to enforce, this Court is empowered to hear it.

written settlement agreement was the source of the Mendelson defendants' duty to make the interim monthly payments from October through December of 1992. This argument is presumably based on the fact that the December 29 agreement sets forth time limits for interim payments. This argument is, to say the least, not well thought out, since the deadlines for interim payments stated in the December 29 agreement *predate* December 29. Simply put, it is legally impossible for an agreement to create in a party a duty to act *prior* to the date that the agreement was reached.[13]

Second, Feingold argues that the October 6, 1992 letter constituted *the* agreement of the parties and that the December 29, written settlement agreement was merely a formality which memorialized and presumably fleshed out non-material terms of the October 6 agreement. This argument also fails.

■ A "preliminary" settlement agreement is enforceable under Pennsylvania law[14] only if the parties involved intend to be bound by its terms. As stated by one court in the context of enforcing a settlement agreement:

> If parties agree upon essential terms and intend them to be binding, "a contract is formed even though they intend to adopt a formal document with additional terms at a later date." *Courier Times, Inc. v. United Feature Syndicate, Inc.*, 300 Pa.Super. 40, 54, 445 A.2d 1288, 1295 (1982).... The intent of the parties is a question of fact which must be determined by the factfinder.

*Johnston v. Johnston*, 346 Pa.Super. 427, 431, 499 A.2d 1074, 1076–77 (1985) (citations omitted). For Feingold to prevail on this theory, he would need to show that the terms of the October 6 letter stating that the Mendelson defendants would make interim monthly payments to the escrow agent prior to the December distribution were terms by which the parties intended to be bound. The Court, without much difficulty, concludes that they were not.

■ As noted above, the Weinbergs repeatedly testified at the hearing that the parties never intended to be bound until all parties had settled all issues and a *final* settlement agreement had been duly executed. The Court credits this testimony over that of Feingold as being reasonable and consistent with the conduct of the parties during the settlement process.

In the first place, all parties continued to negotiate over various material terms of the settlement after the signing of the October 6 letter. Indeed, as noted *supra*, Feingold himself insisted on changing the date for final payment from December 28, 1992 to December 24, 1992. Feingold cannot possibly claim that the negotiations over the date for final payment were immaterial, since he himself argues that the distribution of funds was, in fact, late, and that this late distribution is so important as to justify recision of the contract. *See* Section IIC, *infra*. *See also* Transcript, at 61 (Feingold states that he included as exhibits to his motion contrasting versions of the settlement agreement, changing the date for final payment from December 28 to December 24, "to show my change to show that time was impor-

---

13. Feingold's argument could be interpreted as a claim that the settlement agreement was void when signed on December 29, 1992, since that agreement stated that "there [would] be no settlement" if the interim payments were not made "in accordance with the above schedule." This argument would postulate that the parties intended for the agreement to be rendered inoperative if all of the interim payments had not been made at the time that the last party signed, i.e. that tender of the interim payments was a condition precedent to the formation of the agreement. While it is conceivable that a contract could be drafted to that effect, it would seem to the Court that the parties in this case would have more clearly expressed their intention if they wanted to

create such an unusual condition. The more probable interpretation of events, and the one adopted by this Court, is that the parties inadvertently neglected to modify the written settlement agreement as the dates for the putative interim payments passed during the course of negotiations. This interpretation is supported by the testimony given at the hearing, discussed *infra*, and, in any event, is more in keeping with common sense absent any evidence to support a contrary explanation.

14. No party appears to contest the applicability of Pennsylvania law to the issue of settlement enforcement.

tant.").[15]  Additionally, there is no evidence that Feingold ever made any effort to ascertain whether the Mendelson defendants were making their interim payments until after Feingold signed the agreement.  While the existence of the Mendelson defendants' obligation to make interim payments is not dependant on Feingold's act of inquiring into whether they were made, his failure to do so is probative of whether Feingold believed such an obligation existed.  It is also significant that there is no evidence that any of the parties that were notified of the Weinbergs' act of withholding the checks ever raised any objection to such withholding.[16]  Indeed, it appears that the parties continued to negotiate over the terms of the settlement agreement even as each of the interim payment dates set forth in the October 6 letter came and went, without "compliance" by the Mendelson defendants or objection from any party.  Finally, it is notable that of all the parties, including two who were represented

by Feingold in this case, Feingold is the only one who claims that the parties intended to be bound by the terms of the October 6 letter.

For the reasons above, the Court finds that the parties entered into a binding settlement agreement on December 29, 1992, when the last party executed the written settlement agreement, and not before then.[17]

## C.  *Substantial Performance*

█ The Court also finds that Feingold would be required to refrain from suing the Mendelson defendants even if the October 6 letter created binding obligations.  The law in Pennsylvania relating to the effect of non-performance of settlement agreements was summarized by the Third Circuit in *Polish American Machinery Corporation v. R.D. & D. Corp.*, 760 F.2d 507, 511 (3d Cir.1985):

15.  Moreover, the final version of the settlement includes a provision regarding the assignment of the rights of plaintiffs Capek and Scipione to Feingold that was not included in the original draft.  Feingold attempted to establish at the hearing that a binding agreement regarding this assignment was reached during the conference in chambers, or, in any event, prior to the signing of the October 6, 1992 letter.  Although this assignment is referred to generally in the October 6 letter, the Court concludes that the parties continued to negotiate with regard to material issues relating to the assignment even after the signing of the October 6 letter.  *See* Transcript, at 58, 68–70.  The Court acknowledges that at least one Pennsylvania court has stated that an assignment of rights provision is not an "essential term" vis-a-vis an initial settlement agreement when "there is no evidence to support the claim that this term was an essential term of the settlement agreement."  *See Compu Forms Control, Inc. v. Altus Group, Inc.*, 393 Pa.Super. 294, 574 A.2d 618, 623 (1990).  In this case, however, the parties discussed assignment of rights prior to the signing of the October 6 letter, and the issue of assignment was a "severe concern" to Mendelson.  Transcript, at 58.

16.  In fairness to Feingold, Jay Rothman, Esquire, who took over as escrow agent after the previous escrow agent became ill in mid-November of 1992, did testify that he spoke with Weinberg in December of 1992 and inquired as to why the Mendelson defendants' payments had not been placed in the escrow account.  Rothman also stated that it was his understanding that interim payments were to have been delivered to the escrow agent.  Transcript of Febru-

ary 16, 1993 Hearing, at 102, 104.  Rothman's testimony as to his "understanding" of the agreement, however, cannot be afforded great weight as he was not involved in this matter in any way prior to the date on which he assumed his responsibilities as escrow agent and did not participate in the negotiations surrounding the agreement.

17.  Some of Feingold's statements at the hearing may be construed as an argument that the September 24 in chambers "agreement" between all parties other than Capek and Scipione was revived, *in toto*, at a later date when Capek and Scipione orally assented to its provisions.  In so arguing, Feingold overlooks the status of negotiations at the conclusion of the in chambers conference.  It is agreed by all, including Feingold, that upon the court's advice, the parties left chambers with the understanding that *no* agreement had been reached.  That a later agreement reached by some of the parties may mirror the in chambers putative agreement does not mean that the parties who entered into the later agreement resurrected the in chambers agreement.  Feingold's position might be more persuasive if the parties ceased negotiations the evening of the in chambers conference with the understanding that an agreement *had* been reached, subject to later joinder by Capek and Scipione.  As noted above, however, the parties did not so agree.  Feingold did not present any evidence at the hearing that could support the conclusion that the parties intended for Capek and Scipione to have the power to resurrect the previously failed agreement in the event they later changed their minds and decided to agree to terms.

Under Pennsylvania law, an unperformed settlement agreement will bar reinstitution of a prior claim only if the mere promise to perform in the settlement agreement supplies the consideration for the release of the prior claim. If the consideration for the release of the prior claim is performance of the settlement agreement, however, only substantial performance of the obligor's duties under the agreement will extinguish the prior claim. *See Schwartzfager v. Pittsburgh, Harmony, Butler and New Castle Railway Co.*, 238 Pa. 158, 164, 85 A. 1115 (1913); *Hydro–Flex, Inc. v. Alter Bolt Co., Inc.*, 223 Pa.Super. 228, 296 A.2d 874, 878 (1972); *Auslander v. Shore*, 84 Pa.Super. 164, 166, 22 D. & C. 709 (1924).

It seems apparent that if the October 6 letter were to be construed as an agreement, the consideration for Feingold's act of refraining from suit was actual payment of the settlement amount, not a simple promise to pay, in that the letter states that "if . . . all of the $330,000 settlement fund is not fully paid within ninety days, any monies paid will be returned, [and] there will be no settlement. . . ."[18] Thus, under the rule stated in *Polish American*, only substantial performance of a settlement agreement would preclude reinstitution of Feingold's claim. The Court finds that even if the October 6 letter created binding obligations, the Mendelson defendants substantially performed them.

Feingold alleges that the Mendelson defendants' failure to make interim payments has caused him two types of injury. Feingold first maintains that he has lost his share of the interest that would have accumulated on the payments if they had been properly escrowed. This injury, however, epitomizes the term "*de minimis.*" If the Mendelson defendants' interim payments had been placed in an escrow account bearing 5% percent interest compounded annually, the total amount of interest that would have accumulated amounts to approximately $406.98.[19] Assuming that the plaintiffs would divide the accrued interest according to the same proportion as their share of the entire settlement,[20] Feingold would be entitled to only 12% of the total interest, since Feingold was to have received 12% of the total settlement ($40,000 out of $330,000). Twelve percent of the total interest that would have accumulated on the Mendelson payments that were not escrowed amounts to $48.83. The Mendelson defendants' failure to tender the three payments to the escrow agent therefore resulted in a loss to Feingold of an amount representing only approximately 0.001 percent of his $40,000 in settlement proceeds.

Perhaps in tacit recognition of the fact that his lost interest damages are so insubstantial, Feingold also alleges that the failure of the Mendelson defendants to make interim payments into the escrow account caused the settlement funds to be disbursed in an untimely fashion. As his second type of injury,

18. Assuming the validity of the October 6 letter as a binding contract, it could be argued that payment thereunder was simply a *condition* to Feingold's act of refraining from suit, and that the actual *consideration* supplied by the defendants in exchange for Feingold's execution of a release was the defendants' mere promise to pay. In that event, Feingold's suit would certainly be barred under the rule of *Polish American*. The Court need not resolve this issue, as it determines that the defendants have substantially performed their duties under the agreement; Feingold is, therefore, barred from suit regardless of whether the consideration for the release was a promise to pay or actual payment.

19. The annual amount of interest on $25,000 at 5 percent is $1,250, or approximately $3.42 in interest per day. The figure above was calculated by: 1) determining the number of days that each payment would have been collecting interest had

it been escrowed on the payment date set forth in the agreement (69 days for the October payment, 38 days for the November payment, and 12 days for the December payment), 2) for each payment, multiplying that number by $3.42, and then 3) adding together the interest that would have accumulated on the three payments.

20. The parties have not informed the Court of how they actually divided the interest that accrued on the monies placed in escrow account. The settlement agreement itself does not set forth the method for such division. The October 6 letter, however, does state that the interest would be divided "in proportion to [each plaintiff's] respective share." Of course, the fact that this method of dividing interest was set forth in the October 6 letter is not binding, since the Court has determined that the October 6 letter is not a contract. Such a division of interest would, however, seem to be most logical.

Feingold contends that he suffered damages as a result of this late distribution. As best the Court can determine, the basis for this assertion is Feingold's claim that if the Mendelson defendants had made payments into the escrow account on a monthly basis, with the last payment on December 24, 1992, as somehow "required" by the settlement agreement of December 29, then all settlement funds would have been available for distribution in 1992 since the checks would have then had time to clear.

Feingold's argument is unavailing for two reasons. First, the terms of the settlement agreement would have permitted distribution of the settlement funds after the end of 1992 even if the Mendelson defendants had made their last interim payment on December 24th, 1992. The settlement agreement itself provided that the earliest possible date on which distribution would be required was "the fifth business day following deposit of the last funds in the account." The fifth business day after December 24, 1992 was not in 1992, but, rather, was January 4, 1993. Under Feingold's argument, the date on which payment was "due," December 24, 1992, must be counted as the first day of the five day period for purposes of calculating when distribution had to be made. Feingold's method of calculating time, however, is contrary to the generally accepted practice.[21] Accordingly, distribution in 1993 would have been permitted under the settlement agreement even if the Mendelson defendants had tendered interim payments on the dates now asserted by Feingold.

Second, in correspondence to the escrow agent dated Wednesday, January 6, 1993, Feingold stated that as to distribution of the settlement proceeds, he "could have lived with Monday and even yesterday . . . ." At the hearing, Feingold reiterated that he would not have suffered damage if he was able to deposit his share of the settlement proceeds at his bank on January 5, 1993. It was also adduced at the hearing that Feingold's law office is five to ten minutes from his bank, and that the escrow agent's office is

no more than 15 minutes from Feingold's office. Nothing in the record indicates that Feingold's bank closed on January 5 at any time before the close of normal banking hours, i.e. 3:00 p.m. Despite these facts, when the escrow agent telephoned Feingold at approximately 2:15 p.m. on January 5 to tell Feingold that he was about to hand deliver the settlement check, Feingold instructed the escrow agent not to deliver the check since Feingold would be unable to get the check to his bank before it closed. Timely delivery of the check to Feingold's bank under these circumstances, however, was obviously still well within reason. Any injury suffered by Feingold as a result of "late" distribution was, therefore, caused by Feingold's own action. Accordingly, such injury cannot be considered when determining whether the Mendelson defendants' act of withholding the interim payments, even if a breach of the settlement, was so substantial as to justify excusing Feingold from his obligation to refrain from suit.

Also relevant is the fact that Feingold has presented absolutely no evidence of any damage he may have suffered by virtue of the purported late distribution. At the hearing, Feingold stated that as of January 5, 1993 his losses arising out of the Mendelson defendants' alleged breach were "over $10,000, almost $15,000." Transcript, at 9. There is nothing in the record, however, to support this bald assertion. When asked by the Court at the hearing why Feingold needed distribution of the funds on or before January 5, 1993, Feingold's only response was, "taxes, they were due by dinnertime or four o'clock or whatever, so I had to put the money in the bank by then to write a check." Transcript, at 9. Earlier, Feingold had testified simply that he "had a $50,000 loan that had to be repaid by the 31st, I had taxes that had to be paid January 5th." Transcript, at 7. The only other testimony that might be considered relevant to the issue of Feingold's "late payment" damages was Allen Weinberg's testimony that Feingold had told him

**21.** *See, e.g.,* Fed.R.Civ.P. 6(a) (stating that the "day of the act or default for which the designated period of time begins to run shall not be included"); Pa.R.Civ.P. 106 (with only limited exceptions not herein applicable, time under the Rules shall be "so computed as to exclude the first and include the last day of such period.").

that Feingold sought earlier distribution of the money "because—I don't remember, you [Feingold] either bought a boat or you had a payment on a boat that you wanted to make...." Transcript, at 76. Needless to say, these vague assertions do not bolster Feingold's damages claims.

The relevant factors in determining whether contractual obligations are substantially performed are set forth in Restatement, Contracts (Second) § 241. These factors are:

i. the extent to which the injured party will be deprived of the benefit which he reasonably expected;

ii. the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

iii. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

iv. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

v. the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*See Oak Ridge Construction Co. v. Tolley,* 351 Pa.Super. 32, 504 A.2d·1343, 1348 (1985).

Considering these factors, there is little doubt that there has been no material breach of the settlement agreement. Feingold has presented evidence of only the most insignificant injury. Even if the Mendelson defendants breached an agreement by failing to tender interim payments to the escrow agent, such a breach can hardly be deemed material when it amounts to such a minuscule reduction in Feingold's recovery. Feingold can certainly be adequately compensated for any injury arising out of the Mendelson defendants' failure to escrow the interim payments without recision of the settlement agreement.[22] Further, the Mendelson defendants did not act in bad faith in their failure to escrow the funds. As stated above, the lawyers ensured that the checks were in their possession and ready to be delivered upon execution of the agreement by all parties. Upon being notified that the last party had signed the settlement agreement, the interim payments were immediately delivered to the escrow agent. By contrast, if any party did not proceed in good faith with respect to the settlement of this lawsuit it is Feingold himself, who, after unreasonably refusing to make an attempt to deposit the tendered settlement funds, now seeks to void a $40,000.00 settlement[23] on the ground that he did not receive $48.83 in interest plus some other amount that he has not disclosed.[24] *See generally Fleekop v. Mann*

---

**22.** Of course, nothing in this opinion should be read to preclude Feingold from seeking to enforce the settlement agreement by suing the Mendelson defendants to collect his lost interest damages (plus any other damages) in a separate action. The Court rules only that, since the Mendelson defendants have substantially performed, Feingold's performance under the contract, i.e. his duty to refrain from suing on the underlying claim, is not excused.

**23.** Feingold apparently seeks to rescind the settlement only insofar as it relates to his claims against the Mendelson defendants, i.e. he seems to argue that *he* may now sue the Mendelson defendants, but he does not claim that the agreements reached among the other parties, including two other plaintiffs who he ostensibly represents as a lawyer in this action, are now void. *See* Transcript, at 113.

**24.** Feingold refers to the interim payments as the "heart" and "essence" of the agreement. *See, e.g.,* Feingold response to the Mendelson defendants' motion, at 11. The October 6 letter, how-

ever, states that "If ... *all of the $330,000 settlement fund* is not fully paid within ninety days, any monies paid will be returned, [and] there will be no settlement. .." (emphasis added). The letter later states that "[e]veryone should understand that unless *all settlement funds* are paid by the defendants by December 28, 1992 and can be disbursed to plaintiffs the next day, there is no settlement and the case will proceed to trial" (emphasis added). As evidenced by these passages, the core obligation under the October 6 letter, if any, was timely distribution of the *full* settlement amount, not the timely escrowing of interim payments. It is true that the December 29, 1992 agreement states that there would be no settlement if the interim payments were not made. *See* note 13, *supra.* Nonetheless, it seems obvious to the Court that the tendering of interim payments pales in comparison to final distribution of the full settlement funds when considering the "essence" of the agreement. Feingold's argument that the interim payments were the "heart" of the agreement is therefore rejected.

*Music Center,* 89–6846, 1990 WL 204253, 1990 U.S.Dist. LEXIS 16895 (E.D.Pa. December 12, 1990) (defendants' substantial performance of payment obligations under settlement agreement requires rejection of plaintiff's attempt to reinstate a settled case on the trial list).

## III. *CONCLUSION*

The Mendelson defendants' failure to escrow the interim payments does not excuse Feingold from his obligation to refrain from suit. First, the Mendelson defendants had no obligation to escrow the interim payments. Specifically, the settlement agreement of December 29, 1992 did not include a requirement that the Mendelson defendants make interim payments to the escrow agent on specific dates since the due dates of the interim payments set forth in the agreement preceded the date of the agreement's execution, and the October 6, 1992 letter created no binding duty to escrow the funds. Second, even if a requirement to escrow interim payments on specific dates existed, the Mendelson defendants' failure to comply with that requirement did not constitute a material breach of the settlement, so that Feingold is not excused from performing his duties thereunder. For these reasons, Feingold's motion must be denied and the Mendelson defendants' motion must be granted.

An appropriate Order will be entered.

## APPENDIX A

October 6, 1992

Gentlemen:

The day after our settlement conference I received copies of letters to Judge Robrino [sic] from each of you suggesting that you would agree to a counter proposal made by my clients.

Specifically we suggested that all of the settlement funds ($330,000) be paid within the next ninety days as per the agreement reached on September 24th, with the last two $25,000 payments being made by Mr. Mendelson within sixty and ninety days respectively. If all settlement monies are in fact paid, they will be disbursed to the plaintiffs, the necessary releases and assignments will be exchanged and the case will be dismissed with prejudice pursuant to Local Rule 23(b). If, however, all of the $330,000 settlement fund is not fully paid within ninety days, any monies paid will be returned, there will be no settlement, and the case would proceed to trial against all parties. I assume that the case management schedule which was handed to us on September 24th would be held in abeyance pending the ninety day period.

As I understand the details of the settlement agreement, the "Mendel" defendants have agreed to pay a total of $155,000— $27,000 within five days and the balance of $128,000 within thirty days. The "Mendelson" defendants have agreed to pay a total of $175,000—$100,000 within five days, $25,000 within thirty days, $25,000 within sixty days and the final $25,000 within ninety days. This would create a settlement fund of $330,000 which would be disbursed to the plaintiffs as follows:

| | |
|---|---|
| John Capek | $85,000 |
| C.R. Scipione | 85,000 |
| William Kozin | 80,000 |
| A. Feingold | 40,000 |
| A. Jacobi | 40,000 |
| TOTAL | 330,000 |

The money will be placed in an interest-bearing account and each of the plaintiffs will receive his/her pro-rata share of the total interest in proportion to his/her respective share as stated above.

In addition, mutual general releases will be exchanged between the plaintiffs and defendants and Capek and Scipione will assign any claims they may have against other parties arising out of the Kidder Street property to the Feingold plaintiffs. The Mendel defendants and the Mendelson defendants agree to execute mutual General Releases of all claims against each other and all Hampton entities except Mr. Mendel's claims against Franklin Square Hospital and Hampton Hospital Group, Inc. and any of their predecessor or successor entities or any assignee or designee thereof. The Mendelson defendants will release the Mendel defendants from all claims arising out of the Kidder Street property.

Since we essentially reached this agreement on or about September 28th and since I have been advised by counsel for Mendel and Mendelson that the checks for the first payments have already been cut, the second payments by both parties would be due on or before October 28th. The third payment by Mendelson would be due by November 28th and the final payment by Mendelson would be due on or before December 28, 1992.

John Walter's firm has agreed to act as the escrow agent for the settlement funds and all checks should be delivered to him.

If the foregoing is agreeable, please sign below to indicate that we have reached a settlement agreement in principle with the understanding that the necessary releases and assignments will still have to be drafted.

I will send a copy of this letter once it is signed to Judge Robrino [sic] and request that he hold the discovery schedule in abeyance until December 28, 1992. Everyone should understand that unless all settlement funds are paid by the defendants by December 28, 1992 and can be disbursed to plaintiffs the next day, there is no settlement and the case will proceed to trial.

[LETTER SENT BY COUNSEL FOR PLAINTIFFS CAPEK AND SCIPIONE AND SUBSEQUENTLY SIGNED BY ALL PARTIES]

### ORDER

AND NOW, TO WIT, this 10th day of May, 1993, upon consideration of Plaintiff Allen L. Feingold's motion to strike, set aside, and mark void the settlement agreement between the parties (Docket No. 44), defendants Mark Mendelson and Hampton Real Estate Group, Inc.'s ("the Mendelson defendants") motion to enforce the settlement agreement and strike Feingold's motion (Docket No. 46), and the Mendelson defendants' motion to quash Feingold's subpoena and notice of deposition and for sanctions (Docket No. 45), IT IS ORDERED, for the reasons set forth in the accompanying memorandum, that:

i. Feingold's motion to strike, set aside, and mark void the settlement agreement is *DENIED* as moot, in that no settlement agreement was ever recorded on the docket of this Court;

ii. The Mendelson defendants' motion to enforce the settlement agreement is *GRANTED;*

iii. The Mendelson defendants' motion to strike Feingold's motion to enforce the settlement agreement is *DENIED;*

iv. The Mendelson defendants' motion to quash Feingold's subpoena is *DENIED AS MOOT;*

v. The Mendelson defendants' motion for sanctions is *DENIED.* This denial is based primarily on the fact that the Court cannot conclude that it was outrageous for Feingold to contend that a document signed by counsel for all parties was a binding agreement. Although this contention was rejected by the Court, its assertion does not rise to a level of frivolity sufficient to justify the imposition of sanctions. The Court also concludes that Feingold's failure to demonstrate sufficient damage arising out of the alleged breach of the settlement agreement does not justify the award of sanctions under the facts of this case;

vi. Defendants shall cause the escrow agent to deliver to Feingold forthwith those funds to which Feingold is entitled under the terms of the December 29, 1992 settlement agreement;

vii. The Clerk shall mark this case "closed."